

RECEIVED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JAN 3 0 2004

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

Luther D. Thomas
Clerk, U.S. District Court
75 Spring St., Room 2211
Atlanta  GA  30303

---

January 29, 2004

RE: 02-13213-HH      Janet Bogle v. William McClure
DC DKT NO.:  00-02071 CV-BBM-1

TO:   Luther D. Thomas

CC:   Willie Jake Lovett, Jr.

CC:   June D. Green

CC:   Carmen Robinson Alexander

CC:   Griffin B. Bell

CC:   H. Lane Dennard, Jr.

CC:   Lovita T. Tandy

CC:   Kelly Jean Beard

CC:   Michael J. Bowers

CC:   Christopher S. Anulewicz

CC:   Michael B. Terry

CC:   Joshua F. Thorpe

CC:   Administrative File

## United States Court of Appeals

RECEIVED IN CLERK'S OFFICE
U.S.D.C. Atlanta

Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia  30303

Thomas K. Kahn
Clerk

JAN 3 0 2004

In Replying Give Number
Of Case And Names of Parties

Luther D. Thomas  Deputy Clerk          January 29, 2004
Clerk, U.S. District Court
75 Spring St., Room 2211
Atlanta  GA  30303

RE: 02-13213-HH      Janet Bogle v. William McClure
DC DKT NO.:  00-02071 CV-BBM-1


The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued
as the mandate of this court.

Also enclosed are the following:
    Original Exhibits, consisting of: two boxes
    Original record on appeal or review, consisting of: thirty volumes

The district court clerk is requested to acknowledge receipt on the copy of this letter enclosed
to the clerk.

A copy of this letter, and the judgment form if noted above, but not a copy of the court's
decision, is also being mailed to counsel and pro se parties. A copy of the court's decision
was previously mailed to counsel and pro se parties on the date it was issued.


                        Sincerely,

                        THOMAS K. KAHN, Clerk

                        Reply To: James O. Delaney (404) 335-6113


Encl.

MDT-1 (12-2003)

# United States Court of Appeals

## For the Eleventh Circuit

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JAN 3 0 2004

LUTHER D. THOMAS, Clerk
By
Deputy Clerk

---

No. 02-13213

---

District Court Docket No.
00-02071-CV-BBM-1

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Jun 6, 2003

THOMAS K. KAHN
CLERK

JANET BOGLE,
SHERRI BOWERS,
MONICA FODERINGHAM-BROWN,
JO LYNN BURGE,
MAUREEN KELLY, et al.,

Plaintiffs-Appellees,

versus

WILLIAM MCCLURE, in his individual
capacity and in his official capacity
as Chairman of the Atlanta-Fulton County
Public Library Board of Trustees,
MARY JAMERSON WARD,
MARY HOOKER, in her individual capacity and in her
official capacity as Director of the
Atlanta-Fulton County Public Library,
BENJAMIN JENKINS, in his individual
capacity and in his official capacity
as a member of the Atlanta-Fulton County
Public Library Board of Trustees,

Defendants-Appellants,

BRENDA S. BANKS,
BECKY FERN, et al.,

Defendants.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By:
Deputy Clerk
Atlanta, Georgia

---

Appeal from the United States District Court
for the Northern District of Georgia

---

## J U D G M E N T

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

ISSUED AS MANDATE

JAN 2 9 2004

U.S. COURT OF APPEALS
ATLANTA, GA.

Entered:      June 6, 2003
For the Court:   Thomas K. Kahn, Clerk
        By:   Gilman, Nancy

BOGLE v. McCLURE                                    2620

Janet BOGLE, Sherri Bowers, et
al., Plaintiffs-Appellees,

v.

William MCCLURE, in his individual ca-
pacity and in his official capacity as
Chairman of the Atlanta–Fulton County
Public Library Board of Trustees, Mary
Jamerson Ward, et al., Defendants-Ap-
pellants.

No. 02–13213.

United States Court of Appeals,
Eleventh Circuit.

June 6, 2003.

Caucasian librarians brought § 1983 suit
against members of board of trustees for
public library system and director of system,
alleging race discrimination. The United
States District Court for the Northern Dis-
trict of Georgia, No. 00-02071-CV-BBM-1,
Beverly B. Martin, J., entered judgment
upon jury verdict for librarians, and defen-
dants appealed. The Court of Appeals, Black,
Circuit Judge, held that: (1) defendants were
not entitled to qualified immunity in § 1983
action; (2) instruction that librarians had to
prove, by preponderance of evidence, that
acts of race discrimination by defendants
were proximate or legal cause of damages
sustained by librarians adequately instructed
jury not to find for librarians if they believed
librarians would have been transferred irre-
spective of race; (3) memoranda authored by
counsel for county, providing legal advice to
defendants, regarding proposed personnel
reorganization, was not protected by attor-
ney-client privilege; (4) award of $ 500,000 to
each librarian in compensatory damages was
not abuse of discretion; (5) evidence sup-
ported award of punitive damages; and (6)

punitive damages award of approximately $ 2
million per librarian was reasonable and not
excessive in violation of the due process
clause.

Affirmed.

1. Civil Rights ⟨⟩214(2)

Qualified immunity offers complete pro-
tection for government officials sued in their
individual capacity if their conduct does not
violate clearly established statutory or consti-
tutional rights of which reasonable person
would have known.

2. Civil Rights ⟨⟩214(1, 2)

In determining whether government of-
ficial is entitled to qualified immunity, court
must ask whether plaintiff's allegations, if
true, establish violation of constitutional or
statutory right, and if constitutional or statu-
tory right would have been violated under
plaintiff's version of facts, whether right was
clearly established.

3. Civil Rights ⟨⟩214(4)

Members of board of trustees for public
library system and director of system were
not entitled to qualified immunity from Cau-
casian librarians' § 1983 action, alleging race
discrimination; defendants violated librarians'
constitutional rights by transferring them on
basis of race, it was clearly established that
intentional discrimination in workplace violat-
ed federal law, and record did not indisput-
ably establish that defendants were motivat-
ed, at least in part, by lawful reasons.  42
U.S.C.A. § 1983.

4. Civil Rights ⟨⟩238

Qualified immunity is an affirmative de-
fense to § 1983 action that may be waived.
42 U.S.C.A. § 1983.

Synopsis, Syllabi and Key Number Classification
COPYRIGHT © 2003 by WEST GROUP

The Synopsis, Syllabi and Key Number Classifi-
cation constitute no part of the opinion of the court.

**BOGLE v. McCLURE**

**5. Federal Courts ⬤⟲616**

Members of board of trustees for public library system and director of system waived argument that they were entitled to qualified immunity from Caucasian librarians' § 1983 action, alleging that their transfers were result of race discrimination, because reasonable public official in defendants' position would not have known transfers were adverse employment actions; at trial, defendants stipulated that transferring people because of their race was contrary to law of the United States. 42 U.S.C.A. § 1983.

**6. Civil Rights ⬤⟲245**

Instruction in § 1983 action, stating that Caucasian librarians had to prove, by preponderance of evidence, that acts of race discrimination by members of board of trustees for public library system and director of system were proximate or legal cause of damages sustained by librarians adequately instructed jury not to find for librarians if they believed the librarians would have been transferred irrespective of race. 42 U.S.C.A. § 1983.

**7. Federal Civil Procedure ⬤⟲2176.1**

Refusal to give requested jury instruction is erroneous only if (1) requested instruction correctly stated law, (2) instruction dealt with issue properly before jury, and (3) failure to give instruction resulted in prejudicial harm to requesting party.

**8. Federal Civil Procedure ⬤⟲2236**
   **Federal Courts ⬤⟲907**

Failure to give requested jury interrogatories may not be error, or if error may be harmless, where jury verdict itself, viewed in light of jury instructions, and any interrogatories that were answered by jury, indicate without doubt what the answers to refused interrogatories would have been, or make answers to refused interrogatories irrelevant.

**9. Witnesses ⬤⟲205**

Memoranda authored by counsel for county, providing legal advice to members of board of trustees for public library system and director of system, regarding proposed personnel reorganization, was not protected from disclosure in Caucasian librarians' § 1983 action, alleging race discrimination, by attorney-client privilege, absent showing that memoranda was intended to remain confidential or that it was reasonable under the circumstances to expect memoranda to be confidential. 42 U.S.C.A. § 1983.

**10. Witnesses ⬤⟲222**

The party invoking attorney-client privilege has burden of proving that attorney-client relationship existed and that particular communications were confidential.

**11. Witnesses ⬤⟲205**

To determine if particular communication is confidential and protected by attorney-client privilege, privilege holder must prove communication was (1) intended to remain confidential and (2) under circumstances was reasonably expected and understood to be confidential.

**12. Federal Courts ⬤⟲823**

Court of Appeals reviews district court's evidentiary rulings for abuse of discretion.

**13. Civil Rights ⬤⟲274**

Award of $500,000 in compensatory damages in § 1983 action per Caucasian librarian, who sustained emotional harm due to race discrimination by members of board of trustees for public library system, and director of system, was not abuse of discretion. 42 U.S.C.A. § 1983.

**14. Civil Rights ⚖=271**

Although compensatory damages must be proven in race discrimination action, general compensatory damages, as opposed to special damages, need not be proved with high degree of specificity and may be inferred from circumstances.

**15. Civil Rights ⚖=271, 273**

Plaintiff may be compensated for intangible, psychological injuries as well as financial, property, or physical harms, resulting from race discrimination.

**16. Civil Rights ⚖=273**

*Humiliation and insult are recognized,* recoverable harms, and plaintiff's own testimony of embarrassment and humiliation can be sufficient to support award for compensatory damages for race discrimination.

**17. Federal Courts ⚖=813**

Court of Appeals reviews district court's decision to sustain compensatory damages for clear abuse of discretion.

**18. Federal Courts ⚖=795**

After trial court has reviewed and remitted jury award of compensatory damages to specific amount, court's decision is accorded presumption of validity.

**19. Federal Courts ⚖=871**

Standard of review for awards of compensatory damages for intangible, emotional harm in race discrimination action is deferential to fact finder because harm is subjective and evaluating it depends considerably on demeanor of witnesses.

**20. Civil Rights ⚖=275(1)**

Evidence supported award of punitive damages in Caucasian librarians' § 1983 action against members of board of trustees for public library system and director of system, alleging race discrimination; defendants knew at the time they transferred librarians that it violated federal law to transfer people on basis of race, defendants were warned by county attorney, personnel department, and director about legal problems with transfers, but defendants still transferred the librarians. 42 U.S.C.A. § 1983.

**21. Civil Rights ⚖=275(1)**

**Constitutional Law ⚖=303**

Punitive damages award, in § 1983 action, of approximately $2 million to each Caucasian librarian, who was discriminated against on basis of race by members of board of trustees for public library system and director of system, was reasonable and not excessive in violation of the due process clause; there was evidence that defendants knew their conduct was illegal, and concocted plan to hide their discriminatory motives, and punitive damages award was reasonable and proportionate to amount of harm to librarians and to general damages recovered. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**22. Federal Courts ⚖=776**

Court of Appeals conducts *de novo* review of trial court's determination as to constitutionality of jury's punitive damages award.

**23. Civil Rights ⚖=275(1)**

Title VII cap on punitive damages awards for race discrimination was not determinative with respect to awards available for race discrimination in § 1983 action, as § 1983 did not contain a cap. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. § 1983.

Appeal from the United States District Court for the Northern District of Georgia.

Before DUBINA and BLACK, Circuit Judges, and RYSKAMP*, District Judge.

BLACK, Circuit Judge:

This case involves claims of race discrimination at the Atlanta–Fulton Public Library System (AFPLS) brought by Appellees, seven Caucasian female librarians, against Appellants, members of the AFPLS Board of Trustees and the Director of the AFPLS. Appellees (the Librarians) claim Appellants transferred them from their jobs at Central Library to dead-end jobs at branch libraries because of their race. Appellants, however, claimed the transfers were part of a legitimate, nondiscriminatory reorganization plan. The jury found for the Librarians. After post-trial motions, judgment was entered in favor of the Librarians for a total of approximately $17 million in compensatory and punitive damages. On appeal, Appellants argue the district court erred by (1) not granting their motion for judgment as a matter of law on the grounds of qualified immunity; (2) not giving their requested jury instruction and interrogatory on a mixed-motive defense; (3) admitting documents into evidence that were protected by the attorney-client privilege; (4) sustaining approximately $3.5 million in compensatory damages for emotional distress; and (5) sustaining approximately $13.3 million in punitive damages.

## I.

The AFPLS consists of Central Library (Central), the main public library in downtown Atlanta, and more than 30 branch li-

braries. The AFPLS is governed by a 17-member Board of Trustees (the Board). The Board sets library policy, but is not responsible for the day-to-day management of the library system. Instead, the Board hires a Director who serves as the administrative head of the library system.

At the time of the transfers at issue in this case, Appellant William McClure was Chairman of the Board. Appellant Benjamin Jenkins was a member of the Board and Chairman of the Board's Personnel Committee. Appellant Mary Jamerson Ward was a member of the Board and a member of the Personnel Committee. Appellant Mary Hooker was Director of AFPLS.

When Hooker was hired as Director in 1999, she began planning a system-wide reorganization. Hooker testified that, after she was hired, she visited branch libraries, talked to library personnel, reviewed workload reports, analyzed the staffing needs at the libraries, and concluded that the branch libraries needed additional professional librarians. Hooker testified that new technologies would create staffing redundancies at Central while increasing the need for services at the branch libraries. Hooker planned to reorganize the local branch libraries into geographic "clusters" to serve local needs more effectively. Although Hooker never developed a written, comprehensive reorganization plan, she testified she had a plan or vision for how the library was going to be reorganized, she occasionally discussed her ideas with the Board, and the Board generally approved reorganizing to provide more services through the branch libraries.

Another reoccurring issue for Appellant Board members was the low number of Afri-

* Honorable Kenneth L. Ryskamp, United States District Judge for the Southern District of Flori-    da, sitting by designation.

~American managers at Central. For example, Ward stated the "white dominated ministration" at Central was a problem d told fellow Board member Nancy Puck-; there were "too many white faces" working at Central and it "was not welcoming to ack folks to see so many white faces" in ,entral management. Former Assistant Director of Public Services Paulette Smith-Epps testified McClure asked her what she planned to do about the fact that there was only one African–American manager at Central and McClure's "idea was to move people from Central out to the branches and maybe do a swap and bring some black managers into Central."

On more than one occasion, Appellant Board members asked for data on the race of managers at Central. In a January 2000 Board meeting, Hooker presented to the Board, in response to their request, a document entitled *Branch & Unit Management by Race* which contained the names, race, gender, location, and classification of all AFPLS managers. After the Board members discussed this document, McClure concluded that the number of African–American managers at Central was an issue the Board was going to have to address and directed the Personnel Committee to place the issue high on their agenda.

In an April 11, 2000, meeting of the Personnel Committee, Hooker recommended transferring employees from their jobs at Central to jobs at the branch libraries. Hooker noted that, based on her analysis of the library system, many branch libraries were understaffed while Central library was overstaffed. Some of the Board members expressed concern over reassigning employees before a more complete reorganization plan was developed. Hooker responded that more analysis was needed, but given the need for service in the branches she recommended moving forward with the reassignments. McClure also encouraged the Committee to move forward with the reassignments. In the course of this discussion, Board member Blake stated, "As people are moved or promoted, it gives us a marvelous opportunity for us to look at fairness and representation of ethnic groups wherever they are needed. We have mentioned, from time to time, how many people are at Central in top level positions that are African–Americans." [1] After more discussion on the proposed transfers, the Personnel Committee tabled the issue and decided to meet again on April 19 to continue their discussion.

In the meantime, Hooker sought advice from the Fulton County Personnel Department. Personnel Manager Paris Brown testified she told Hooker some of the proposed transfers did not appear to conform to Fulton County policy regarding job responsibilities for employment classification. Personnel Director Robert Brandes, however, testified he was not aware of any problems and he simply told Hooker "to be cognizant of the fact when you move people or transfer people, you have to be sure that their duties and responsibilities will not have a potential negative effect on the [job] classification."

On April 13, 2000, Hooker wrote a memo to McClure regarding the proposed transfers. She stated, "Because the potential for significant problems was identified by [the Fulton County] Personnel [Department], I recommend that the Personnel Committee of the Board of Trustees refrain from advancing

---

1. At trial, Blake testified that by making this statement she was not advocating discrimination against Caucasian employees or more favorable treatment for African-American employees.

the re-organization until each transfer and re-assignment is reviewed and evaluated. Significant legal ramifications could be present...." Hooker specifically mentioned certain staff members "must maintain the same level of responsibility in their new assignments as at their previous assignments." Hooker also stated, "The objectivity of the selection process for the staff to be re-assigned has not been determined. According to Fulton County, transfers are customarily done laterally. This would not be the case in this re-organization because levels of responsibility would not remain the same."

On the same day, Hooker sent to the Board members newspaper articles about several recent discrimination cases brought by Caucasian employees against Fulton County. One article described an Eleventh Circuit decision upholding a jury's finding that the Fulton County Sheriff and her department engaged in racial discrimination, but reducing the damages the jury awarded the 16 Caucasian deputies. Another article described the settlement of a lawsuit against Fulton County involving allegations that an employee was passed over for a salary increase because he was Caucasian while another worker, who was African–American, received a pay hike. A third article described Fulton County's settlement of an employment discrimination lawsuit filed by a Caucasian firefighter. According to Hooker, she sent these articles to the Board in response to an anonymous email asking her to share the information with the Board, and it was not connected to the proposed transfers.

On April 14, 2000, Hooker talked to June Green of the Fulton County Attorney's Office about whether the proposed transfers would violate Fulton County personnel policies. On April 17, 2000, Green wrote a memorandum to Hooker, with copies to McClure, stating:

In [our] conversation you advised me that you had spoken to Bob Brandes of the Fulton County Personnel Department, and he advised you that the reorganization that has been proposed by the Library Board of Trustees will likely violate Fulton County Personnel Policies and Procedures. You specifically mentioned race, age and gender discrimination and unfair demotion. Although you asked for some legal guidance, I advised you that it would be hard to give legal advice in a vacuum and that you should put your concerns in writing and attach a copy of the proposed reorganization.

... Of course, I would expect to be able to review the proposal before its implementation so that any legal advice that I have may be useful.

On the same day, McClure sent a letter to Hooker, with copies to the Board, Brandes, Green, and the Board Secretary, stating:

After reviewing your memorandum of April 13, 2000, which recommended not advancing the plans for reorganization, I am requesting that you proceed with the development of the comprehensive reorganization plan, in accordance with the timeline you established of April 2000. Your memo clearly establishes that we are not currently able to determine if a "potential for significant problems" exist, since you have not defined the new duties and responsibilities for any potential position to be reassigned. However, no clear determination can be made until you have developed a comprehensive plan and defined the position responsibilities. Therefore, the prudent course of action would be to develop a comprehensive reorganization plan, complete the requisite position description work, review it with the County Personnel Department to remedy any potential policy conflicts, and submit the plan to the Per-

sonnel Committee of the Board of Trustees for review and approval

. . . .

Ms. Hooker, it is important to recognize that *improved service* and *equity*[2] strongly dictate that reorganization is necessary, as you have also agreed. I hope that we can move ahead with this process in an expeditious manner.

On April 19, 2000, the Personnel Committee met again to discuss the proposed reassignments. Hooker presented the Committee with a document entitled *Strategic Service Equity Proposal–Phase 1 (Team Concept)*. This document recognized the need to restructure the library system and "flatten"[3] the organization by deploying high level librarians into the branch teams. At the meeting, Hooker proposed reassigning 23 positions. First, however, she recommended that the proposals be reviewed by the County's Legal Department and Fulton County Personnel Department as a precautionary measure. The Personnel Committee agreed and directed Hooker to proceed and work with the County's Personnel Director to resolve any conflict with County policies and classifications.

On May 11, 2000, the Personnel Committee met again to discuss the proposed transfers. Hooker informed the Personnel Committee that, for the most part, the transfer issues had been resolved. A document distributed at that meeting stated:

On Monday, May 1st, 2000, the library system director met with the Fulton County Personnel Department Classification [and Pay Chief] to discuss and review the library's positions, classifications, titles and

essential duties. As a result of this meeting, there were no findings that would prohibit the Library System from reassigning its staff based on the need to restructure and re-engineer its services (in accordance with the Fulton County Personnel Regulations).

After discussing the proposed transfers, the Personnel Committee voted to approve 28 reassignments as well as several new hires and one promotion.

The next day, May 12, 2000, Hooker wrote a letter to Fulton County Attorney June Green stating, "the Personnel and Staffing Reassignments meet all the requirements and are appropriate as they relate to the essential duties, service delivery and reorganization plan within the library system." Hooker asked Green for a written response. On May 22, Green responded:

Although you ask me to provide a written response, you provide me nothing to which a response is required or to which a response could be made. . . . If you have any questions about these [personnel] transactions, your memorandum does not ask them. The New Hires and one Promotion are probably not problematic. You should look closely at the reassignments, however. Your memorandum does not compare old job duties to new job duties in the reassignments. Are salaries, position titles or classifications changing? If so, you should review those changes closely with the Personnel Director to make sure that no Personnel Rules and Regulations are being violated. Can I safely assume that none of the reassignments amount to demotions? If not, then you should also

---

2. The Librarians suggested Appellants' use of the word "equity" referred to racial issues. Appellants, however, denied this.

3. Like the word "equity," the Librarians suggested "flattening" the organization was a code word for race-based transfers. Again, Appellants denied this.

review those with the Personnel Director. If the Personnel Director has reviewed and cleared all of these personnel transactions then you are probably on safe legal ground. As stated above, however, you have not asked me any questions nor have you provided me with enough information to answer any.

On May 24, 2000, Jenkins presented to the Board the proposed new hires, promotion, and transfers. Jenkins twice referred to the vote as one on new hires only. The Board unanimously voted to approve the personnel actions. Board member Puckett entered the Board meeting just after the vote. She asked Jenkins what had happened on the vote, and he told her the Board had only voted on the new hires and not the proposed reassignments, although apparently the Board had approved all of the 28 reassignments as well as the new hires and promotion.

The following morning, May 25, 2000, Hooker held a staff meeting at which she passed out the reassignment list. This was the first the employees or their supervisors knew of the reassignments. Hooker offered no job descriptions for the transferees, did not explain how they would fit into their new positions or what their job duties would include, and responded to their questions with vague, noncommittal answers. At trial, Hooker testified she made the reassignment decisions without input from the staff because she had lost confidence in their advice.

Of the 28 employees who were transferred, 15 were African–Americans and 13 were Caucasians, including the seven Librarians in this action. None of the seven Librarians experienced a decrease in pay, classification, or benefits; however, they all claim to have suffered significant demotion in their job duties and responsibilities. The Librarians presented evidence that all but two of the African–Americans on the transfer list received lateral transfers or promotions, and that the two African–Americans who did not receive lateral transfers or promotions had been critical of the Board in the past.

The Librarians testified to the emotional and mental pain they suffered as a result of their transfers. The Librarians testified about their meaningful and exciting managerial positions at Central, their decades of experience as professional librarians, and the years of training and education invested in their careers. For example, Nancy Powers had 30 years of experience with AFPLS, and Janet Bogle, who wanted to be a librarian since the fourth grade, had a Masters Degree in Library Science and 32 years of professional library experience. The Librarians claimed Appellants destroyed their careers by transferring them to dead-end jobs at the branch libraries where they did menial, non-managerial tasks such as shelve books, clean refrigerators and computers, dust furniture, and photocopy documents.[4] The Librarians testified the transfers caused them significant emotional harm and made them feel embarrassed, humiliated, stunned, confused, angry, frightened, discouraged, and betrayed. For example, Jo Lynn Burge testified: "I can't begin to tell you what a toll it has taken on me. To be an active and producing person and then to suddenly be just put on the shelf and made to sit there through no purpose of my own or no doing of my own, I could not help that I was hurt."

4. Unlike the other Librarians, Mary Stark was not transferred to a branch library, but was transferred to a different position within Central. Nevertheless, she testified that her transfer was in effect a demotion because she was transferred from a system-wide management position to a nonmanagerial position in which her primary duties were housekeeping duties.

Appellants testified that their concern over the low number of African-American managers at Central had nothing to do with the Librarians' transfers, and that the transfers, instead, were the first part of a reorganization plan designed to provide more services in the branch libraries. The Librarians, on the other hand, argued the transfers were based on race and the reorganization plan was a sham or cover-up.

Evidently rejecting Appellants' defense that the Librarians were transferred as part of a race-neutral reorganization, the jury found for the Librarians and awarded approximately $23 million in compensatory and punitive damages. The district court denied Appellants' renewed motion for judgment as a matter of law and motion for a new trial. The district court, however, granted in part Appellants' motion with regard to damages and remitted the total award to approximately $17 million. This appeal followed.

## II.

### A. Qualified Immunity

[1–3] Qualified immunity offers complete protection for government officials sued in their individual capacity if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitz-

gerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The Supreme Court has set forth a two-part test for qualified immunity. First, the court must ask whether the plaintiff's allegations, if true, establish the violation of a constitutional or statutory right. Hope v. Pelzer, 536 U.S. 730, 736, 122 S.Ct. 2508, 2513, 153 L.Ed.2d 666 (2002); Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). If a constitutional or statutory right would have been violated under the plaintiff's version of the facts, the next step is to ask whether the right was clearly established. Hope, 536 U.S. at 739, 122 S.Ct. at 2515.

Viewing the facts in the light most favorable to the Librarians, see FDIC v. Stahl, 89 F.3d 1510, 1514 (11th Cir.1996), Appellants violated the Librarians' constitutional rights by transferring them on the basis of their race. Moreover, there is no doubt that in May 2000, when the Librarians were transferred, it was clearly established that intentional discrimination in the workplace on account of race violated federal law. See Alexander v. Fulton County, Ga., 207 F.3d 1303, 1321 (11th Cir.2000).

[4, 5] Appellants, however, argue they are entitled to qualified immunity under Foy v. Holston, 94 F.3d 1528 (11th Cir.1996).[5] In Foy we noted that, in a case involving mixed motives, the presence of a jury issue about a

---

5.  Appellants also argue they are entitled to qualified immunity because a reasonable public official in their position would not have known the transfers were adverse employment actions. Appellants, however, have waived this argument. Qualified immunity is an affirmative defense that may be waived. See Skrtich v. Thornton, 280 F.3d 1295, 1306 (11th Cir.2002); Caban–Wheeler v. Elsea, 71 F.3d 837, 842 (11th Cir.1996); Ansley v. Heinrich, 925 F.2d 1339, 1348 (11th Cir. 1991); Moore v. Morgan, 922 F.2d 1553, 1557 (11th Cir.1991). At trial, Appellants stipulated "that transferring people because of their race

was contrary to the law of the United States." Appellants told the district court, "We have never argued that the Defendants didn't know that transferring people based on their race is against the law. That's fundamental. I mean, and every defendant knows that." A few moments later, the district judge stated that Appellants "knew it was a violation of federal law to transfer people on the basis of their race," and Appellants responded, "Absolutely." Under these circumstances, Appellants are precluded from raising this argument.

**2629**          **BOGLE v. McCLURE**

defendant's improper intent does not necessarily preclude qualified immunity. *Id.* at 1533. ("Where the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful *and* unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity."). In *Stanley v. City of Dalton, Ga.,* 219 F.3d 1280 (11th Cir.2000), we explained that a "defendant is entitled to qualified immunity under the *Foy* rationale only where, among other things, the record *indisputably* establishes that the defendant in fact was motivated, *at least in part,* by lawful considerations." *Id.* at 1296 (first emphasis added); *see also Johnson v. City of Ft. Lauderdale, Fla.,* 126 F.3d 1372, 1379 (11th Cir.1997).

Appellants argue the transfers were part of a race-neutral, system-wide reorganization in which resources and personnel were being moved from overstaffed Central library to understaffed branch or cluster libraries. However, given the Librarians' evidence suggesting the reorganization plan was a sham designed to cover up the race-based transfers, a reasonable jury had reason to doubt Appellants' asserted nondiscriminatory reason for the transfers. Viewing the facts in the light most favorable to the Librarians, the record evidence does not undisputably indicate that Appellants were in fact motivated, at least in part, by objectively valid reasons. Therefore, Appellants were not entitled to qualified immunity under *Foy.*[6]

**B.  *Jury Instruction and Interrogatory***

[6] Appellants argue it was error for the district court to refuse to give their request-

ed jury instruction and interrogatory on their mixed-motive defense. The proposed instruction stated:

> Even if you find that the Plaintiffs' race and sex played a role in the Defendants' decision to include them in the May 25, 2000 reorganization, Defendants cannot be held liable if they show that the same decision would have been made even in the absence of the impermissible criterion. Thus, if you find that the Defendants would have included Plaintiffs in the May 25, 2000 reorganization, without any consideration of their race or sex, then the Defendants cannot be held liable.

Appellants' proposed interrogatory asked the jury whether "the Plaintiffs would have been included in the May 25, 2000 reorganization even in the absence of the [Defendant's] consideration of the Plaintiffs' race?"

[7] *A refusal to give a requested jury instruction is erroneous only if* "(1) the requested instruction correctly stated the law, (2) the instruction dealt with an issue properly before the jury, and (3) the failure to give the instruction resulted in prejudicial harm to the requesting party." *Roberts & Schaefer Co. v. Hardaway Co.,* 152 F.3d 1283, 1295 (11th Cir.1998); *see also Wood v. President and Trustees of Spring Hill Coll.,* 978 F.2d 1214, 1222 (11th Cir.1992) ("In considering the failure of the district court to give a requested instruction, the omission is error only if the requested instruction is correct, not adequately covered by the charge given, and involves a point so important that failure to give the instruction seriously impaired the party's ability to present an effective case."). We have recently explained:

6. Additionally, the jury squarely found that Appellants intentionally discriminated against the Librarians on account of race, and, in so doing, unambiguously rejected their proffered nondis-

criminatory reasons. *See Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1321 (11th Cir. 2000).

This Court applies a deferential standard of review to a trial court's jury instructions. If the trial judge's instructions accurately reflect the law, he or she is given wide discretion as to the style and wording employed in its instruction. Further, under this standard, we examine whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled.

*McCormick v. Aderholt,* 293 F.3d 1254, 1260 (11th Cir.2002) (quotation marks and citations omitted).

[8] We employ the same deferential standard of review to the district court's special interrogatory verdict form. *See Johnson v. Breeden,* 280 F.3d 1308, 1314 (11th Cir.2002). With regard to omitted jury interrogatories, we have stated:

[F]ailure to give requested jury interrogatories may not be error, or if error may be harmless, where the jury verdict itself, viewed in the light of the jury instructions, and any interrogatories that were answered by the jury, indicate without doubt what the answers to the refused interrogatories would have been, or make the answers to the refused interrogatories irrelevant. . . .

*Id.* at 1318.

The Librarians offer several reasons why the district court properly rejected Appellants' proposed jury instruction and interrog-

atory.[7] The Librarians also argue the district court's proximate cause instruction and interrogatory cured any potential error in not giving the requested mixed-motive instruction and interrogatory.

The district court's proximate cause instruction stated the Librarians must prove, by a preponderance of the evidence, that Appellants' acts of discrimination "were the proximate or legal cause of damages sustained by the [Librarians]." The instructions explained, "For damages to be the proximate or legal result of wrongful conduct, it must be shown that, except for such conduct, the damages would not have occurred." The district court's special interrogatory asked the jurors whether each Appellant's acts were the proximate or legal cause of damages sustained by each Librarian. The jury answered "yes" to this question as to each Appellant and each Librarian.

The jury's answer to the proximate cause interrogatory in effect means that, except for discrimination, the Librarians would not have been transferred. This finding precludes Appellants' mixed-motive defense, which rests on the jury finding, irrespective of discrimination, the Librarians would have been transferred for race-neutral reasons. The proximate cause instruction adequately instructed the jury not to find for the Librarians if they believed the Librarians would have been transferred irrespective of race. If the jury had believed this, they would have

---

7. First, the Librarians argue the proposed instruction was improper because it contained references to gender discrimination, which was no longer at issue in the case. Second, they claim that by referring to a "reorganization" the instruction and interrogatory improperly presupposes the existence of a reorganization plan and implicitly adopts Appellants' theory of the case (that the transfers were part of a race-neutral reorganization) and rejects the Librarians' theory of the case (that the reorganization was a post-

hoc fabrication designed to cover up Appellants' race-based decision to transfer the Librarians). Third, they argue Appellants were not entitled to a mixed-motive instruction or interrogatory because they presented no credible evidence that the transfers were made for any reason other than the Librarians' race. Additionally, they argue Appellants waived their objection to the omission of their proposed jury instruction and interrogatory because they failed to state the grounds for their objection.

**2631**                                                    **BOGLE v. McCLURE**

answered the proximate cause interrogatory in the negative. However, the jury's affirmative answer to the proximate cause interrogatory indicates, without doubt, what the answer to the mixed-motive interrogatory would have been. Thus, there was no error in refusing to give Appellants' instruction and interrogatory, or if there were error, it would be harmless. *See Johnson*, 280 F.3d at 1318.[8]

### C. Attorney–Client Privilege

[9] Appellants argue the district court improperly admitted two memoranda (the Green memoranda) written by Fulton County Attorney June Green to Hooker because the memoranda were protected by the attorney-client privilege.

[10–12] "The party invoking the attorney-client privilege has the burden of proving that an attorney-client relationship existed and that the particular communications were confidential." *United States v. Schaltenbrand*, 930 F.2d 1554, 1562 (11th Cir.1991). To determine if a particular communication is confidential and protected by the attorney-client privilege, the privilege holder must prove *the communication was* "(1) intended to remain confidential *and* (2) under the circumstances was *reasonably* expected and understood to be confidential." *United States*

*v. Bell*, 776 F.2d 965, 971 (11th Cir.1985). We review the district court's evidentiary rulings for abuse of discretion. *Judd v. Rodman*, 105 F.3d 1339, 1341 (11th Cir.1997).

The Green memoranda were authored by June Green, counsel for Fulton County, and were addressed to Hooker, with copies sent to McClure. The memos provided legal advice regarding the proposed personnel reorganization, but were not designated either "privileged" or "confidential." Appellants did not present evidence regarding who, if anyone, received the memoranda other than Hooker and McClure, what Hooker or McClure did with the memoranda once received, or whether Hooker, McClure, or Green understood the memoranda to be confidential.[9] Additionally, it was not reasonable under the circumstances to expect the memoranda to be confidential because the memoranda might have been public records under the Georgia Open Records Act. *See* O.C.G.A. §§ 50–18–70, 50–18–72(e)(1).[10] Therefore, the district court did not abuse its discretion in admitting the Green memoranda.

### D. Compensatory Damages for Emotional Harm

[13] At trial, the Librarians testified to the emotional and mental pain they suffered

---

8. Appellants also argue the district court did not "submit an interrogatory directed to the pivotal issue under *Foy* and *Stanley*-whether Defendants acted, at least in part, out of lawful motives." Appellants, however, did not request such an instruction, and the district court did not plainly err in not giving such an instruction.

9. Appellants argue they did not present evidence on these issues because the district court's interpretation of the Georgia Open Records Act rendered these issues irrelevant. The district court's order denying Appellants' motion in limine, however, was based on both the Georgia Open Records Act and the lack of evidence establishing confidentiality. Furthermore, the district court's

interpretation of the Georgia Open Records Act does not excuse Appellants from meeting their burden of proving the communication confidential and within the attorney-client privilege.

10. The Green memoranda may or may not fall within the attorney-client-privilege exemption to the Georgia Open Records Act, *see* O.C.G.A. § 50-18-72(e)(1), depending on whether we adopt Appellants' or the Librarians' interpretation of this exemption. Regardless of who is correct on this issue of statutory interpretation, the fact that the Green memoranda are arguably public records under the Georgia Open Records Act buttressed the district court's ruling.

as a result of being transferred from meaningful, supervisory positions to dead-end, nonmanagerial jobs. The Librarians testified the race-based transfers effectively destroyed their careers, and some testified the transfers caused them to resign or go on worker's compensation. When describing their emotional harm, the Librarians testified the transfers "upset," "embarrassed," "humiliated," and "ashamed" them. Some Librarians testified the transfers caused them to become depressed and one even became suicidal. Other than their own testimony, the Librarians presented no independent medical evidence of mental or physical harm.

The jury awarded each Librarian $1 million for emotional harm to be divided among Appellants as follows: $350,000 against McClure; $300,000 against both Hooker and Ward; and $50,000 against Jenkins. The district court granted in part Appellants' motion for remittitur, reducing the compensatory damages for emotional distress to $500,000 per Librarian to be divided among Appellants as follows: $150,000 against McClure, Hooker, and Ward; and $50,000 against Jenkins. Appellants argue the evidence does not support an award of $500,000 per Librarian for emotional distress.

[14–16] Although compensatory damages must be proven, general compensatory damages, as opposed to special damages, need not be proved with a high degree of specificity and may be inferred from the circumstances. *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir.1999). "A plaintiff may be compensated for intangible, psychological injuries as well as financial, property, or physical harms." *Id.* "Humiliation and insult are recognized, recoverable harms," and a plaintiff's own testimony of embarrassment and humiliation can be sufficient to support an award for compensatory damages.

*Id.* (citing *Marable v. Walker*, 704 F.2d 1219, 1220 (11th Cir.1983)).

[17–19] We review the district court's decision to sustain compensatory damages for clear abuse of discretion. *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1249 (11th Cir.2001). After a trial court has reviewed and remitted a jury award to a specific amount, the district court's decision is accorded "a presumption of validity." *Ferrill*, 168 F.3d at 476. The standard of review for awards of compensatory damages for intangible, emotional harm is "deferential to the fact finder because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses." *Patterson v. P.H.P. Healthcare Corp.* 90 F.3d 927, 938 (5th Cir.1996) (quotation marks omitted).

After reviewing the record, we discern no reason to substitute our judgment for that of the jury or the district court as to the amount of damages necessary to compensate the Librarians for their emotional pain and suffering. *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir.1999). Therefore, we conclude the district court did not abuse its discretion in sustaining awards of $500,000 per Librarian for emotional harm.

*E. Punitive Damages*

The jury awarded each Librarian $2 million in punitive damages, divided among Appellants as follows: $700,000 against McClure; $600,000 against Hooker; $600,000 against Ward; and $100,000 against Jenkins. This resulted in a total punitive damage award of $4.9 million against McClure; $4.2 million against Hooker; $4.2 million against Ward; and $700,000 against Jenkins. The district court upheld the punitive awards against McClure, Hooker, and Ward, but re-

mitted the punitive award against Jenkins from $100,000 per plaintiff to no award at all. Appellants argue the district court erred in sustaining these punitive damages.

[20] First, Appellants argue against imposing any punitive damages at all because they did not "discriminate in the face of a perceived risk that [their] actions will violate federal law" as required by *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 536, 119 S.Ct. 2118, 2125, 144 L.Ed.2d 494 (1999). At trial, however, Appellants' counsel admitted that Appellants "knew it was a violation of federal law to transfer people on the basis of race." This admission is not surprising considering that, at the time of the transfers, it was clearly established intentional discrimination in the workplace on account of race violated federal law. *See Alexander*, 207 F.3d at 1321. Furthermore, there was evidence at trial that Appellants were warned by Fulton County Attorney Green, the Personnel Department, and even Hooker herself about significant legal problems with the transfers. Thus, there was sufficient evidence for a reasonable jury to award punitive damages. *See Lambert v. Fulton County, Ga.*, 253 F.3d 588, 597–98 (11th Cir.2001) (holding that defendant's knowledge that it is illegal to treat employees differently on account of race, coupled with credible evidence that defendant intentionally did so, is sufficient for a reasonable jury to conclude that the *Kolstad* standard for punitive damages has been satisfied); *Alexander*, 207 F.3d at 1337–38 (same).

[21, 22] Second, Appellants argue, even if punitive damages in some amount could be justified, the awards in this case were exces-

sive. The Supreme Court has recognized constitutional principles of due process prohibit the imposition of grossly excessive or arbitrary punishments on a tortfeasor. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562, 116 S.Ct. 1589, 1592, 134 L.Ed.2d 809 (1996). In *Gore*, the Supreme Court instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Gore*, 517 U.S. at 575, 116 S.Ct. at 1598–99. We conduct a *de novo* review of the trial court's application of the *Gore* guideposts to the jury's punitive damage award. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436, 121 S.Ct. 1678, 1685–86, 149 L.Ed.2d 674 (2001).

Recently, in *State Farm Mut. Auto. Ins. Co. v. Campbell*, —— U.S. ——, 123 S.Ct. 1513, —— L.Ed.2d—— (2003), the Supreme Court reiterated the importance of the *Gore* guideposts and mandated exacting appellant review of a trial court's application of them to the jury's award to ensure "that an award of punitive damages is based on an application of the law, rather than a decisionmaker's caprice." *Id.* at 1520–21. Addressing each guidepost from *Gore* in some detail, the *Campbell* Court concluded the jury's punitive award of $145 million "was neither reasonable nor proportionate to the wrong committed, and it was an irrational and arbitrary deprivation of the property of the defendant."[11] *Id.* at 1526. Unlike *Campbell*, an application of the *Gore* guideposts to the

---

11. The Supreme Court reversed the punitive damages award in *Campbell*, in large part, because the award was based, in part, on out-of-

state conduct that was lawful where it occurred and conduct that bore no relation to the plaintiff's harm. *See id.* at 1521–25.

**BOGLE v. McCLURE**                    **2634**

facts of this case demonstrates that the puni-
tive damages award was not a violation of
due process.

The Supreme Court has described the first
*Gore* guidepost—the degree of reprehensibil-
ity of the defendant's conduct—to be the
" 'most important indicium of the reasonable-
ness of a punitive damages award.' " *Id.* at
1521. (quoting *Gore,* 517 U.S. at 575, 116
S.Ct. at 1599). In *Campbell,* the Supreme
Court explained:

> We have instructed courts to determine
> the reprehensibility of a defendant by con-
> sidering whether: the harm caused was
> physical as opposed to economic; the tor-
> tious conduct evinced an indifference to or
> a reckless disregard of the health or safety
> of others; the target of the conduct had
> financial vulnerability; the conduct in-
> volved repeated actions or was an isolated
> incident; and the harm was the result of
> intentional malice, trickery, or deceit, or
> mere accident. The existence of any one
> of these factors weighing in favor of a
> plaintiff may not be sufficient to sustain a
> punitive damages award; and the absence
> of all of them renders any award suspect.
> It should be presumed a plaintiff has been
> made whole for his injuries by compensato-
> ry damages, so punitive damages should
> only be awarded if the defendant's culpa-
> bility, after having paid compensatory
> damages, is so reprehensible as to warrant
> the imposition of further sanctions to
> achieve punishment or deterrence.

*Id.* (citations omitted).

Appellants' wrongdoing was more than
mere accident. There was evidence that, in
the face of repeated warnings, Appellants
intentionally discriminated against the Li-
brarians on the basis of race and used trick-
ery and deceit to cover it up under the guise
of a "reorganization." Furthermore, Appel-
lants intentionally discriminated against the
Librarians with full knowledge of recent
cases of employment discrimination brought
by Caucasian employees against other Fulton
County officials which resulted in jury ver-
dicts for the plaintiffs or settlements. A
reasonable jury could have concluded from
the evidence that Appellants knew that
transferring the Librarians on the basis of
race was illegal, were warned not to make
the transfers, and knew that other Fulton
County officials had been caught and pun-
ished for making employment decisions on
the basis of race; yet Appellants intentional-
ly discriminated against the Librarians and
concocted the "reorganization" plan to hide
their discriminatory motives. Repeatedly,
courts have found intentional discrimination
to be reprehensible conduct under *Gore's*
first guidepost. *See Swinton v. Potomac
Corp.,* 270 F.3d 794, 818 (9th Cir.2001);
*Hampton v. Dillard Dep't Stores, Inc.,* 247
F.3d 1091, 1116 (10th Cir.2001); *United
States EEOC v. W & O, Inc.,* 213 F.3d 600,
615 (11th Cir.2000). This case is no excep-
tion.

Turning to *Gore's* second guidepost, the
Supreme Court has been reluctant to "identi-
fy concrete constitutional limits on the ratio
between harm, or potential harm, to the
plaintiff and the punitive damages award."
*Campbell,* 123 S.Ct. at 1524. Although de-
clining to impose a bright-line ratio which a
punitive damages award cannot exceed, the
Court has recognized that, "in practice, few
awards exceeding a single-digit ratio between
punitive and compensatory damages, to a
significant degree, will satisfy due process."
*Id.* Citing a long history of providing sanc-
tions of double, treble, or quadruple damages
to deter and punish, the Court recently stat-
ed in *Campbell:*

> While these ratios are not binding, they
> are instructive. They demonstrate what

should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios of 500 to 1 [as in *Gore*], or in this case, of 145 to 1.

Nonetheless, because there are no rigid benchmarks that a *punitive damages* award may not surpass, ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages. The converse is also true, however. Where compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.

In sum, courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered.

*Id.* (quotation marks and citations omitted).

The district court pointed out that the ratio between punitive and compensatory damages in this case is in the neighborhood of 4:1, a range which the Supreme Court has found to be "instructive." Although the Librarians received substantial compensatory damages, given the facts of this case, the ratio of punitive damages to compensatory damages does not indicate that the punitive damages award violates due process. In short, the punitive damages award was both

reasonable and proportionate to the amount of harm to the Librarians and to the general damages recovered. *See id.*

[23]   Under the third *Gore* guidepost, Appellants ask us to compare the punitive damages award to the statutory cap of $300,000 per plaintiff for compensatory and punitive damages under Title VII. *See* 42 U.S.C. § 1981a(b)(3). Appellants argue the court should remit the punitive damages so the punitive and compensatory damages total no more than $300,000 per plaintiff. Although a comparison to the Title VII cap may be instructive, to some degree, when analyzing the third *Gore* guidepost, we will not apply the Title VII cap by analogy to employment discrimination cases under § 1983. *See Swinton*, 270 F.3d at 820 (observing that, in contrast to Title VII, "Congress has not seen fit to impose any recovery caps in cases under § 1981 (or § 1983), although it has had ample opportunity to do so since the 1991 amendments to Title VII"). Furthermore, although the punitive damages awarded here are more than the damages available under Title VII for analogous conduct, the difference is not enough, by itself, to suggest that the punitive damages award violates due process. *Cf. Campbell*, 123 S.Ct. at 1526 (finding the most relevant civil sanction to be $10,000, "an amount dwarfed by the $145 million punitive damage award.").

Applying the *Gore* guideposts to the facts in this case, we conclude the punitive damages against McClure, Hooker, and Ward are not so excessive as to violate due process.

AFFIRMED.

A True Copy - Attested:
Clerk, U.S. Court of Appeals
Eleventh Circuit

By
Deputy Clerk
Atlanta, Georgia